Filing # 309178 / 26CV000653 / CULOTTA, VINCENT A.

Lake Co Common Pleas Court, Clerk Carl DiFranco 04/28/2026 01:13 PM

**EXHIBIT A**

## IN THE COURT OF COMMON PLEAS
### LAKE COUNTY, OHIO

| | |
|---|---|
| TAYSHAWNA ROGERS,<br>27100 Lakeshore Blvd.<br>Euclid, OH 44132 | ) CASE NO.<br>)<br>) JUDGE |
| Plaintiff, | )<br>) |
| vs. | ) **PLAINTIFF'S COMPLAINT**<br>) **AGAINST DEFENDANTS**<br>) |
| CAR CONNECTION OF<br>MENTOR INC.,<br>1756 Mentor Ave.<br>Painesville, OH 44077 | ) (Jury Demand Endorsed Herein)<br>)<br>)<br>)<br>) |
| <u>Also Serve:</u><br>C/O Statutory Agent<br>James Hunziker<br>1947 Bremerton Rd.<br>Lyndhurst, OH 44124 | )<br>)<br>)<br>)<br>)<br>) |
| and | )<br>) |
| CREDIT ACCEPTANCE<br>CORPORATION,<br>25505 West Twelve Mile Rd., Ste. 3000<br>Southfield, MI 48034 | )<br>)<br>)<br>)<br>) |
| <u>Also Serve:</u><br>C/O Statutory Agent<br>Corporation Service Company<br>1160 Dublin Rd., Ste. 400<br>Columbus, OH 43215 | )<br>)<br>)<br>)<br>)<br>) |
| Defendants. | )<br>) |

For her Complaint against Defendant Car Connection of Mentor Inc. ("**Car Connection**")

and Defendant Credit Acceptance Corporation ("**Credit Acceptance**"), Plaintiff Tayshawna

Rogers ("**Ms. Rogers**") states, alleges, and avers the following:

1

**I.     PARTIES**

1.      Ms. Rogers resides in Euclid, Ohio.

2.      Car Connection is an Ohio corporation located in Painesville, Ohio.

3.      Car Connection is engaged in the business of selling new and used vehicles and arranging financing for consumers for their personal, family, and household use.

4.      Credit Acceptance Corporation is a foreign corporation with its principal place of business in Southfield, Michigan.

5.      Credit Acceptance is the assigned lender and lien holder at issue in this case.

**II.    FACTS**

6.      On or about February 25, 2026, Ms. Rogers purchased a used 2015 Jeep Cherokee (the "Jeep") from Car Connection. Car Connection did not provide Ms. Rogers with a copy of the Retail Installment Sale Contract.

7.      Car Connection delivered the Jeep to Ms. Rogers on February 25, 2026.

8.      Car Connection advertised the Jeep at one price and then sold the Jeep to Ms. Rogers for a price in excess of that advertised price, raising the purchase price of the Jeep above the advertised price.

9.      Car Connection did not have title to the Jeep when it sold the Jeep to Ms. Rogers. Car Connection obtained title to the Jeep on April 15, 2026 and then processed to transfer title to the Jeep to Ms. Rogers that same day, 49 days after they sold it to her.

**III.   CLAIMS**

**FIRST CLAIM FOR RELIEF**
**(Selling the Jeep Above the Advertised Price and Without Title)**

10.     Ms. Rogers realleges and incorporates the allegations contained in each of the preceding paragraphs as though expressly restated herein.

2

11. Car Connection did not provide Ms. Rogers with copies of all documents she signed in connection with the purchase.

12. Car Connection sold the Jeep to Ms. Rogers without having title, thereby misrepresenting that it had title at the time of sale.

13. By the foregoing conduct, Car Connection committed unfair and deceptive acts and practices in violation of the CSPA.

14. As a direct and proximate result, Plaintiff suffered damages.

## SECOND CLAIM FOR RELIEF
### (Unconscionable Acts in the Sale of the Jeep)

15. Ms. Rogers realleges and incorporates the allegations contained in each of the preceding paragraphs as though expressly restated herein.

16. As set forth above, Car Connection committed unconscionable acts or practices in violation of the CSPA.

17. As a direct and proximate result, Plaintiff suffered damages.

## THIRD CLAIM FOR RELIEF
### Violation of the Ohio Motor Vehicle Certificate of Title Act
### (Failure to Timely Submit and File Application for Certificate of Title)

18. Ms. Rogers realleges and incorporates the allegations contained in each of the preceding paragraphs as though expressly restated herein.

19. Car Connection failed to submit the application for the certificate of title and pay the applicable tax within the time required by law.

20. Car Connection failed to file the application for title to the Jeep for Ms. Rogers within 30 days after Car Connection delivered the Jeep to Ms. Rogers.

21. Title was issued to Ms. Rogers on April 15, 2026, over 30 days after Car Connection delivered the Jeep to Ms. Rogers.

3

22.     Ohio courts have determined that a dealer's failure to make application for title as required by the Title Act constitutes an unfair, deceptive, and unconscionable act or practice in violation of the CSPA.

23.     As a direct and proximate result, Plaintiff suffered damages.

**FOURTH CLAIM FOR RELIEF**
**Violation of the Ohio Motor Vehicle Certificate of Title Act**
**(Failure to Transfer Title Within 40 Days to Purchaser)**

24.     Ms. Rogers realleges and incorporates the allegations contained in each of the preceding paragraphs as though expressly restated herein.

25.     Car Connection transferred title to Ms. Rogers on April 15, 2026, more than forty days after delivery of the Jeep.

26.     Car Connection's failure to transfer title within forty days constitutes an unfair, deceptive, and unconscionable act or practice in violation of the CSPA.

27.     As a direct and proximate result, Plaintiff suffered damages.

**FIFTH CLAIM FOR RELIEF**
**Violation of the Ohio Motor Vehicle Certificate of Title Act**
**(Failure to Have Title at Time of Sale)**

28.     Ms. Rogers realleges and incorporates the allegations contained in each of the preceding paragraphs as though expressly restated herein.

29.     Car Connection displayed the Jeep for sale and sold the Jeep to Ms. Rogers without having obtained a certificate of title in the name of the dealer.

30.     Ohio courts have determined that a dealer's display and sale of a motor vehicle without first obtaining a certificate of title in the dealer's name constitutes an unfair, deceptive, and unconscionable act or practice in violation of the CSPA.

31.     As a direct and proximate result, Plaintiff suffered damages.

## SIXTH CLAIM FOR RELIEF
**Fraud**

32.    Ms. Rogers realleges and incorporates the allegations contained in each of the preceding paragraphs as though expressly restated herein.

33.    On or about February 25, 2026, Car Connection, through its sales representative, finance manager, sales manager, and/or general manager, fraudulently sold Ms. Rogers the Jeep at a price higher than the advertised price, and misrepresented and/or concealed the actual purchase price of the Jeep and the fact that it exceeded the advertised price.

34.    Under Ohio law, automobile dealers owe a duty to disclose material facts about the transaction to purchasers, including the actual price being charged, and Car Connection owed Ms. Rogers that duty.

35.    Car Connection knew that it was concealing from and/or misrepresenting to Ms. Rogers the actual purchase price of the Jeep and that it was significantly higher than its advertised price. Car Connection also acted with utter disregard and recklessness regarding these concealments and/or misrepresentations.

36.     Car Connection's concealments and/or misrepresentations regarding the actual purchase price of the Jeep and that it was significantly above its advertised price were material to the sale of the Jeep to Ms. Rogers, as Ms. Rogers would not have purchased the Jeep had she known about this material issue.

37.    Car Connection's concealments and/or misrepresentations regarding the actual purchase price of the Jeep, and that it exceeded the advertised price, were intended to induce Ms. Rogers into purchasing the Jeep.

38.     As set forth above, Ms. Rogers justifiably relied on Car Connection's concealments and/or misrepresentations.

39. Car Connection acted with malice (reckless, wanton, willful, or gross behavior), ill will, or aggravated or egregious fraud in committing fraud against Ms. Rogers.

40. As a direct and proximate result, Plaintiff suffered damages.

## SEVENTH CLAIM FOR RELIEF
### (Rescission in the Alternative)

41. Ms. Rogers realleges and incorporates the allegations contained in each of the preceding paragraphs as though expressly restated herein.

42. As demonstrated above, Car Connection committed acts and practices determined by Ohio courts to be unfair, deceptive, or unconscionable in violation of the CSPA.

43. Ms. Rogers seeks rescission of her purchase of the Jeep as an alternative to damages.

## EIGHTH CLAIM FOR RELIEF
### Derivative Liability Under the FTC Holder Rule
### (Only Against Defendant Credit Acceptance)

44. Ms. Rogers realleges and incorporates the allegations contained in each of the preceding paragraphs as though expressly restated herein.

45. Upon information and belief, the Retail Installment Sale Contract signed by Ms. Rogers contains the Holder Rule notice mandated by the Federal Trade Commission.

46. Credit Acceptance was the assignee of the Retail Installment Sale Contract and is therefore subject to all claims and defenses that Ms. Rogers could assert against Car Connection.

47. Credit Acceptance has derivative liability to Ms. Rogers if there is a finding of fact that Car Connection violated any law.

48. As a direct and proximate result, Plaintiff suffered damages.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff Tayshawna Rogers respectfully prays for relief against Defendant Car Connection of Mentor Inc. and Defendant Credit Acceptance Corporation as follows:

A. A declaratory judgment that Defendants' acts and practices challenged herein violate the CSPA and the Ohio Motor Vehicle Certificate of Title Act;

B. For all available remedies under the CSPA, and relief available under the Ohio Motor Vehicle Certificate of Title Act;

C. For compensatory and punitive damages on the fraud claim;

D. For derivative liability against Credit Acceptance under the FTC Holder Rule;

E. For reasonable attorney's fees, costs, and expenses;

F. In the alternative, rescission of the purchase of the Jeep;

G. For pre-judgment and post-judgment interest at the statutory rate; and

H. For such other and further relief as this Court deems just and equitable.

Respectfully submitted,

*/s/Ronald I. Frederick*
Ronald I. Frederick (0063609)
Brian E. Roof (0071451)
**Frederick & Berler, LLC**
767 East 185th Street
Cleveland, Ohio 44119
Telephone: (216) 502-1055
Fax: (216) 609-0750
ronf@clevelandconsumerlaw.com
brianr@clevelandconsumerlaw.com

*Counsel for Plaintiff Tayshawna Rogers*


Plaintiff requests a jury on all claims and issues of the maximum number of jurors allowed by law.

*/s/Ronald I. Frederick*
Ronald I. Frederick (0063609)
**Frederick & Berler, LLC**

*One of the Attorneys for Plaintiff Tayshawna Rogers*

8

Filing # 318032 / 26CV000653 / CULOTTA, VINCENT A.
Lake Co Common Pleas Court, Clerk Carl DiFranco 06/17/2026 06:15 PM

**IN THE COURT OF COMMON PLEAS**
**LAKE COUNTY, OHIO**

| | | |
|---|---|---|
| TAYSHAWNA ROGERS, | ) | CASE NO. 26CV000653 |
| | ) | |
| Plaintiff, | ) | JUDGE VINCENT A. CULOTTA |
| | ) | |
| vs. | ) | **PLAINTIFF'S FIRST AMENDED** |
| | ) | **COMPLAINT AGAINST** |
| CAR CONNECTION OF | ) | **DEFENDANTS** |
| MENTOR INC., et al., | ) | |
| | ) | |
| Defendants. | ) | (Jury Demand Endorsed Herein) |
| | ) | |
| | ) | |

For her First Amended Complaint against Defendant Car Connection of Mentor Inc. ("**Car Connection**") and Defendant Credit Acceptance Corporation ("**Credit Acceptance**"), Plaintiff Tayshawna Rogers ("**Ms. Rogers**") states, alleges, and avers the following:

## I.      PARTIES

1.      Ms. Rogers resides in Euclid, Ohio.

2.      Car Connection is an Ohio corporation located in Painesville, Ohio.

3.      Car Connection is engaged in the business of selling new and used vehicles and arranging financing for consumers for their personal, family, and household use.

4.      Credit Acceptance Corporation is a foreign corporation with its principal place of business in Southfield, Michigan.

5.      Credit Acceptance is the assigned lender and lien holder at issue in this case.

1

II.      FACTS

  A.  **The Purchase of the Jeep**

6.  Based on a Facebook advertisement, on February 25, 2026, Ms. Rogers went to Car Connection to purchase a used 2015 Jeep Cherokee with VIN No. 1C4PJMBS2FW649564 (the "**Jeep**") from Car Connection.

7.  Ms. Rogers called Car Connection regarding the Jeep. A Car Connection representative informed Ms. Rogers that Jeep was still available, and she could come in complete an application and check out the Jeep.

8.  When she arrived at Car Connection, Ms. Rogers requested to test drive the Jeep. Instead, the sales representative, Jayden Lloyd ("**Mr. Lloyd**"), steered her away from the Jeep and tried selling her a used Dodge Journey ("**Journey**"). Mr. Lloyd had Ms. Rogers test drive the Journey instead of the Jeep.

9.  After test driving the Journey, Mr. Lloyd informed Ms. Rogers that a bank had accepted the financing for the purchase of the Journey. Ms. Rogers refused and told Mr. Lloyd that she wanted the Jeep.

10.  Mr. Lloyd informed Ms. Rogers that the price for the Jeep was $7,995.00.

11.  Mr. Lloyd stated that the bank would probably deny her the purchase of the Jeep. In response to that comment, Ms. Rogers increased her downpayment by $1,000.00. The bank approved the financing.

12.  Mr. Lloyd never allowed Ms. Rogers to test drive the Jeep.

13.  On February 25, 2026, Ms. Rogers purchased the Jeep for a vehicle price of $8,301.00. A copy of the Bill of Sale is attached as Ex. A. Car Connection did not provide Ms. Rogers with a copy of the Retail Installment Sale Contract.

2

14.     The vehicle price of $8,301.00 for the Jeep is more than the represented and verbal advertised price of $7,995.00. Mr. Lloyd explained that the increase was due to a dealer's fee to increase the purchase price because the bank would not have accepted Ms. Rogers' offer for the Jeep. According to Mr. Lloyd, the bank allegedly would not have accepted Ms. Rogers' offer because the Jeep's price was not high enough to finance. The increase in the purchase price was not detailed in the Bill of Sale or any other document.

15.     Car Connection delivered the Jeep to Ms. Rogers on February 25, 2026.

16.     Car Connection did not have title to the Jeep when it sold the Jeep to Ms. Rogers. Car Connection obtained title to the Jeep on April 15, 2026 and then processed to transfer title to the Jeep to Ms. Rogers that same day, 49 days after they sold it to her. A copy of the Memorandum Title is attached as Ex. B.

17.     On February 25, 2026, Ms. Rogers purchased and received the Jeep for a vehicle price of $8,301.00. *See Ex. A*. Car Connection never provided Ms. Rogers with a copy of the Retail Installment Sales Contract. But a copy of the Retail Installment Sales Contract obtained from Credit Acceptance is attached as Ex. C.

18.     The Jeep's vehicle price of $8,301.00 is more than the represented and verbally advertised price of $7,995.00. Mr. Lloyd explained that the increase was due to a dealer's fee to increase the purchase price because the bank would not have accepted Ms. Rogers' offer for the Jeep. According to Mr. Lloyd, the bank allegedly would not have accepted Ms. Rogers' offer because the Jeep's price was not high enough to finance. The increase in the purchase price was not detailed in the Bill of Sale or any other document.

19.     Car Connection fraudulently induced Ms. Rogers to purchase the Jeep at a higher price of $8,301.00 and misrepresented the reason for the increase in the price to $8,301.00.

3

20.     Car Connection also forced Ms. Rogers to purchase the Extended Warranty or Service Contract for $3,083.00.

21.     The Bill of Sale lists the mileage for the Jeep as 113,757 miles.

22.     The Memorandum of Title for the Jeep states that the Jeep's mileage was 113,757 as of April 15, 2026. *See* Ex. B.

23.     Further, the Jeep's Odometer Disclosure Statement, completed by Car Connection, lists the mileage for the Jeep as 113,757 miles. A copy of the Odometer Disclosure Statement is attached as Ex. D.

24.     However, the actual mileage on the Jeep was 114,080 miles. Ms. Rogers discovered this discrepancy in the mileage after she purchased the Jeep. Ms. Rogers asked Mr. Lloyd about the mileage discrepancy, and he responded that it was from other potential customers test driving it and that a few miles will not make a difference.

25.     Furthermore, the Bill of Sale lists a paint sealant fee of $399.00. The paint sealant fee was not optional and came with all cars. Car Connection required Ms. Rogers to purchase the paint sealant.

26.     Finally, the Jeep has a loud noise and there is damage to the Jeep's passenger right side door and left rear side.

## III.     CLAIMS

### CLAIM 1
**(Selling the Jeep Above the Advertised Price and Without Title)**

27.     Ms. Rogers realleges and incorporates the allegations contained in each of the preceding paragraphs as though expressly restated herein.

28.     Car Connection did not provide Ms. Rogers with copies of all documents she signed in connection with the purchase.

4

29.     Car Connection sold the Jeep to Ms. Rogers without having title, thereby misrepresenting that it had title at the time of sale.

30.     By the foregoing conduct, Car Connection committed unfair and deceptive acts and practices in violation of the CSPA.

31.     As a direct and proximate result, Plaintiff suffered damages.

## CLAIM 2
### (Unconscionable Acts in the Sale of the Jeep)

32.     Ms. Rogers realleges and incorporates the allegations contained in each of the preceding paragraphs as though expressly restated herein.

33.     As set forth above, Car Connection committed unconscionable acts or practices in violation of the CSPA.

34.     As a direct and proximate result, Plaintiff suffered damages.

## CLAIM 3
### Violation of the Ohio Motor Vehicle Certificate of Title Act
### (Failure to Timely Submit and File Application for Certificate of Title)

35.     Ms. Rogers realleges and incorporates the allegations contained in each of the preceding paragraphs as though expressly restated herein.

36.     Car Connection failed to submit the application for the certificate of title and pay the applicable tax within the time required by law.

37.     Car Connection failed to file the application for title to the Jeep for Ms. Rogers within 30 days after Car Connection delivered the Jeep to Ms. Rogers.

38.     Title was issued to Ms. Rogers on April 15, 2026, over 30 days after Car Connection delivered the Jeep to Ms. Rogers.

5

39.     Ohio courts have determined that a dealer's failure to make application for title as required by the Title Act constitutes an unfair, deceptive, and unconscionable act or practice in violation of the CSPA.

40.     As a direct and proximate result, Plaintiff suffered damages.

### CLAIM 4
**Violation of the Ohio Motor Vehicle Certificate of Title Act**
**(Failure to Transfer Title Within 40 Days to Purchaser)**

41.     Ms. Rogers realleges and incorporates the allegations contained in each of the preceding paragraphs as though expressly restated herein.

42.     Car Connection transferred title to Ms. Rogers on April 15, 2026, more than forty days after delivery of the Jeep.

43.     Car Connection's failure to transfer title within forty days constitutes an unfair, deceptive, and unconscionable act or practice in violation of the CSPA.

44.     As a direct and proximate result, Plaintiff suffered damages.

### CLAIM 5
**Violation of the Ohio Motor Vehicle Certificate of Title Act**
**(Failure to Have Title at Time of Sale)**

45.     Ms. Rogers realleges and incorporates the allegations contained in each of the preceding paragraphs as though expressly restated herein.

46.     Car Connection displayed the Jeep for sale and sold the Jeep to Ms. Rogers without having obtained a certificate of title in the name of the dealer.

47.     Ohio courts have determined that a dealer's display and sale of a motor vehicle without first obtaining a certificate of title in the dealer's name constitutes an unfair, deceptive, and unconscionable act or practice in violation of the CSPA.

48.     As a direct and proximate result, Plaintiff suffered damages.

## CLAIM 6
### Fraud

49.     Ms. Rogers realleges and incorporates the allegations contained in each of the preceding paragraphs as though expressly restated herein.

50.     On or about February 25, 2026, Car Connection, through its sales representative, finance manager, sales manager, and/or general manager, fraudulently sold Ms. Rogers the Jeep at a price higher than the advertised price, and misrepresented and/or concealed the actual purchase price of the Jeep and the fact that it exceeded the advertised price.

51.     Under Ohio law, automobile dealers owe a duty to disclose material facts about the transaction to purchasers, including the actual price being charged, and Car Connection owed Ms. Rogers that duty.

52.     Car Connection knew that it was concealing from and/or misrepresenting to Ms. Rogers the actual purchase price of the Jeep and that it was significantly higher than its advertised price. Car Connection also acted with utter disregard and recklessness regarding these concealments and/or misrepresentations.

53.     Car Connection's concealments and/or misrepresentations regarding the actual purchase price of the Jeep and that it was significantly above its advertised price were material to the sale of the Jeep to Ms. Rogers, as Ms. Rogers would not have purchased the Jeep had she known about this material issue.

54.     Car Connection's concealments and/or misrepresentations regarding the actual purchase price of the Jeep, and that it exceeded the advertised price, were intended to induce Ms. Rogers into purchasing the Jeep.

55.     As set forth above, Ms. Rogers justifiably relied on Car Connection's concealments and/or misrepresentations.

7

56. Car Connection acted with malice (reckless, wanton, willful, or gross behavior), ill will, or aggravated or egregious fraud in committing fraud against Ms. Rogers.

57. As a direct and proximate result, Plaintiff suffered damages.

**CLAIM 7**
**Violation of the Truth In Lending Act ("TILA") Claim**
**Failure to Disclose Accurate Financial Terms**

58. Ms. Rogers realleges and incorporates the allegations contained in each of the preceding paragraphs as though expressly restated herein.

59. TILA requires that creditors disclose specific terms, including the "amount financed," the "finance charge," and "the finance charge expressed as an 'annual percentage rate,' using that term" and that these disclosures be made "clearly and conspicuously in writing . . . before consummation of the transaction." 12 C.F.R. §226.17(a)(1) and (b).

60. A "Finance Charge" pursuant to 15 U.S.C.A. § 1605(a), is defined as "the sum of all charges, payable directly or indirectly by the person to whom the credit is extended and imposed directly or indirectly by the creditor as an incident to the extension of credit. The finance charge does not include charges of a type payable in a comparable cash transaction."

61. Car Connection increased the price of the Jeep to Ms. Rogers by $3,083.00 for the Service Contract and $399.00 for the paint sealant.

62. The increased cost of the Service Contract and paint sealant should have been disclosed as a Finance Charge as it was due to Ms. Rogers' paying with credit rather than cash, pursuant to 15 U.S.C. §1640.

63. Car Connection also increased the Jeep's purchase price by $306.00 above its represented price. The $306.00 increase in the Jeep's purchase price above its represented price should have been disclosed as a Finance Charge.

8

64.     Car Connection's failure to accurately include the increase in the sale price above the represented price and the additional product costs as part of the Finance Charge amount means the Retail Installment Sales Contract falsely stated the Amount Financed and understated the Annual Percentage Rate.

65.     Car Connection's failure to provide truthful disclosures violated the requirements of 15 U.S.C. § 1601, *et seq.* and Regulation Z, 12 C.F.R. § 226.

66.     As a result, Ms. Rogers is entitled to recover her actual or statutory damages and attorney's fees, costs, and expenses under TILA.

## CLAIM 8
### Second TILA Violation Claim
### Payment Packing

67.     Ms. Rogers realleges and incorporates the allegations contained in each of the preceding paragraphs as though expressly restated herein.

68.     As demonstrated above, Car Connection engaged in payment packing with the Service Contract and the paint sealant, which is a violation of TILA.

69.     As a result of Car Connection's violation of TILA, Ms. Rogers is entitled to actual or statutory damages, attorney's fees, costs, and expenses under 15 U.S.C. § 1640.

## CLAIM 9
### Violation of the Retail Installment Sales Act ("RISA") Claim
### The APR for the Jeep is Above the Usury Limit of 25%

70.     Ms. Rogers realleges and incorporates the allegations contained in each of the preceding paragraphs as though expressly restated herein.

71.     RISA precludes a seller such as Car Connection from charging a usury rate above the statutory rate of 25%. Car Connection violated this section of RISA.

72.     R.C. § 1317.04 states the following:

9

The written instrument evidencing a retail installment sale and required by section 1317.02 of the Revised Code shall recite the following:

(F) The amount of the finance charge.

73.     R.C. § 1317.061 states the following:

As an alternative to the finance charges permitted in division (A) of section 1317.06 of the Revised Code or the interest permitted in division (B) of that section, and to the finance charges permitted in division (B) of section 1317.11 of the Revised Code, a retail seller or holder may contract for and receive finance charges or interest at any rate or rates agreed upon or consented to by the parties to the retail installment contract or revolving budget agreement, but not exceeding an annual percentage rate of twenty-five per cent.

74.     R.C. § 1317.08 states the following:

(A)(1) No retail installment contract that evidences an indebtedness greater than that allowed under sections 1317.06, 1317.061, 1317.062, and 1317.07 of the Revised Code, and no retail installment contract in connection with which any charge prohibited by sections 1317.01 to 1317.11 of the Revised Code has been contracted for or received, shall be enforceable with respect to that excess indebtedness or charge against any retail buyer or any other person who as surety, endorser, guarantor, or otherwise is liable on the obligation created by any retail buyer on any retail installment contract.

75.     Car Connection violated the usury limits of these provisions of RISA by adding to the purchase price $306.00 above the represented price of $7,995.00. Car Connection also violated these provisions through its payment packing because it forced Ms. Rogers to purchase the Service Contract for $3,083.00 and the $399.00 paint sealant.

76.     The $306.00, $3,083.00, and $399.00 are finance charges because they are charges incident to credit.

77.     With the additional $306.00, $3,083.00, and $399.00 plus the applicable sales tax as finance charges, the APR rate increases to 70.35, over 45.35% above the usury limit of 25%.

10

78. As a result of Car Connection's failure to properly disclose the $306.00, the $3,083.00, and the $399.00 as finance charges, the true APR was usurious (more than 25%) in violation of R.C. § 1317.061.

79. Car Connection's act was willful because it is part of a pattern and practice making Ms. Rogers' damages recoverable under RISA for the amount Car Connection charged in excess of the 8% finance charge permitted on a retail installment contract per R.C. §§ 1317.06(A)(1) and (D).

**CLAIM 10**
**Civil Liability for Criminal Conduct (usury) under R.C. § 2307.60**

80. Ms. Rogers realleges and incorporates the allegations contained in each of the preceding paragraphs as though expressly restated herein.

81. R.C. § 2307.60 states:

(A)(1) Anyone injured in person or property by a criminal act has, and may recover full damages in, a civil action unless specifically excepted by law, may recover the costs of maintaining the civil action and attorney's fees if authorized by any provision of the Rules of Civil Procedure or another section of the Revised Code or under the common law of this state, and may recover punitive or exemplary damages if authorized by section 2315.21 or another section of the Revised Code.

82. 115. R.C. § 2905.22 provides that

(A) No person shall

(2) Knowingly engage in criminal usury.

83. R.C. § 2905.21 defines criminal usury as:

(H) 'Criminal usury' means illegally charging, taking, or receiving any money or other property as interest on an extension of credit at a rate exceeding twenty-five per cent per annum or the equivalent rate for a longer or shorter period, unless either

(1) The rate of interest is otherwise authorized by law;

11

(2) The creditor and the debtor, or all the creditors and all the debtors are members of the same immediate family.

84. Car Connection engaged in a scheme to charge, take, or receive interest in an amount greater than 25% per annum through increasing the Jeep's purchase price by $306.00 above the represented price and including $3,083.00 for the Service Contract and $399.00 for the paint sealant.

85. Car Connection is guilty of criminal usury, and Ms. Rogers is entitled to recover her compensatory and punitive damages and attorney's fees in a civil action under R.C. § 2307.60.

## CLAIM 11
### Ohio's Odometer Rollback and Disclosure Act ("Ohio Odometer Act") Claim
### R.C. § 4549.46(A)

86. Ms. Rogers realleges and incorporates the allegations contained in each of the preceding paragraphs as though expressly restated herein.

87. Pursuant to R.C. § 4549.46(A), "[n]o transferor shall fail to provide the true and complete odometer disclosures required by section 4505.06 of the Revised Code." R.C. § 4505.06 (C)(1) provides the "transferor shall swear to the true selling price and . . . true odometer reading of the motor vehicle."

88. The Bill of Sale, the Memorandum of Title, and the Odometer Disclosure Statement list the mileage for Jeep as 113,757 miles. *See* Exs. A, B, and D.

89. But the Jeep's actual mileage at the date of sale was 114,080 miles. Ms. Rogers asked Mr. Lloyd about the mileage discrepancy, and he responded that it was from other potential customers test driving it and that a few miles will not make a difference.

90. Therefore, Car Connection is liable under the Odometer Act.

91. Ms. Rogers is entitled to damages for Car Connection's odometer violations as permitted under the Ohio Odometer Act.

12

## CLAIM 12
### The Federal Odometer Act Claim
### 49 U.S.C. § 327, *et seq.* and 49 CFR § 580, *et seq*

92. Ms. Rogers realleges and incorporates by reference the allegations contained in each of the preceding paragraphs as though expressly restated herein.

93. The Federal Odometer Act states in relevant part as follows:

> **(1)** Disclosure requirements. Under regulations prescribed by the Secretary of Transportation that include the way in which information is disclosed and retained under this section, a person transferring ownership of a motor vehicle shall give the transferee the following written disclosure:
>
> **(A)** Disclosure of the cumulative mileage registered on the odometer.
> **(B)** Disclosure that the actual mileage is unknown, if the transferor knows that the odometer reading is different from the number of miles the vehicle has actually traveled.
>
> **(2)** A person transferring ownership of a motor vehicle may not violate a regulation prescribed under this section **or give a false statement to the transferee in making the disclosure required by such a regulation.**

49 USCS § 32705(a) [Emphasis Added].

94. In addition, federal regulations require the seller such as Car Connection to comply with odometer disclosure requirements. 49 CFR § 580, *et seq.* "This part prescribes rules requiring transferors and lessees of motor vehicles to make electronic or written disclosure to transferees and lessors respectively, concerning the odometer mileage and its accuracy as directed by sections 408(a) and (e) of the Motor Vehicle Information and Cost Savings Act as amended, 49 U.S.C. 32705(a) and (c)." 49 CFR § 580.01.

95. "At the time a physical or electronic title is issued or made available to the transferee, it must contain the mileage disclosed by the transferor when ownership of the vehicle

13

was transferred and contain a space for the information required to be disclosed under paragraphs (c) through (f) of this section at the time of future transfer." 49 CFR § 580.05(a).

96. "In connection with the transfer of ownership of a motor vehicle, the transferor shall disclose the mileage [the odometer reading at the time of transfer] to the transferee on the physical or electronic title or, except as noted below, on the physical document being used to reassign the title." 49 CFR § 580.05(c).

97. The Ohio Memorandum of Title to the Jeep shows that the Jeep's mileage was 113,757 miles. *See* Ex. B.

98. The Odometer Disclosure Statement for the Jeep shows the mileage at 113,757 miles as of February 25, 2026. *See* Ex. D.

99. But the actual mileage on the Jeep on or about February 25, 2026 was 114,080 miles.

100. Car Connection knew based on reading the Jeep's odometer that the mileage on the Jeep's Memorandum of Title and Odometer Disclosure Statement was incorrect and intended to defraud Ms. Rogers with the incorrect mileage on the Bill of Sale, the Jeep's Memorandum of Title, and Car Connection's Odometer Disclosure Statement.

101. Car Connection also acted with reckless disregard for the truth of the Jeep's mileage or failed to take reasonable steps to verify the accuracy of the odometer reading on the Bill of Sale, the Jeep's Memorandum of Title, and Car Connection's Odometer Disclosure Statement.

102. As demonstrated below, including, without limitation the fraud claim, Car Connection violated the federal odometer disclosure requirements under 49 USCS § 32705(a) and 49 CFR § 580.01 with intent to defraud Ms. Rogers on the Jeep's mileage.

14

103.    The Federal Odometer Act provides for $10,000.00 in statutory damages or three times actual damages (whichever is greater) and attorney's fees, costs, and expenses for failure to comply with the odometer disclosure requirements. 49 USCS § 32710.

104.    As a result of Car Connection's violation of the Federal Odometer Act by failing to disclose the actual or correct odometer mileage on the Jeep, Ms. Rogers is entitled to recover $10,000.00 in statutory damages or three times actual damages (whichever is greater) and attorney's fees, costs, and expenses.

**CLAIM 13**
**Fraud Relating to the Odometer**

105.    Ms. Rogers realleges and incorporates the allegations contained in each of the preceding paragraphs as though expressly restated herein.

106.    On or about February 25, 2026, Car Connection, through its sales representative (Mr. Lloyd), finance manager, sales manager, and/or general manager, at its dealership misrepresented and/or concealed the reason for the increased price of the Jeep. On or about the same date, Car Connection, through its sales representative (Mr. Lloyd), finance manager, sales manager, and/or general manager, at its dealership fraudulently sold Ms. Rogers the Jeep with a lower mileage of 113,757 miles on the Facebook advertisement, Bill of Sale, the Memorandum of Title, and the Odometer Disclosure Statement compared to the Jeep's actual mileage of 114,080. The Facebook advertisement also listed the mileage at 113,757. Car Connection also fraudulently misrepresented and/or concealed the reason for the discrepancy in the mileage.

107.    Under Ohio law, automobile dealerships have a duty to advise purchasers of issues with the vehicle of which it has knowledge, or by the exercise of reasonable care should have knowledge. Also, under Ohio law, automobile dealers owe a duty to disclose material facts about the transaction to purchasers, including the actual price being charged, the actual mileage, and any

15

discrepancy (and the reason for the discrepancy) in the price or the mileage. Car Connection had a duty as a licensed and regulated used car dealer and as the expert in the auto industry to not make these misrepresentations and/or omissions. Further, as the party with all the information regarding the Jeep, Car Connection had a duty not to make these concealments and/or misrepresentations.

108.    Car Connection knew that it concealed from and/or misrepresented to Ms. Rogers the actual purchase price of the Jeep and misrepresented and/or concealed the reason for the increased price of the Jeep. Car Connection further misrepresented the Jeep's mileage on the Facebook advertisement, Bill of Sale, the Memorandum of Title, and the Odometer Disclosure Statement and the reason for the discrepancy of the mileage on these documents and the Jeep's actual milage. Car Connection also acted with utter disregard and recklessness regarding these concealments and/or misrepresentations.

109.    Car Connection's concealments and/or misrepresentations regarding the reason for the increase in the Jeep's purchase price, its actual mileage, and the reason for the lower mileage on the documents were material to the sale of the Jeep to Ms. Rogers, as Ms. Rogers would not have purchased the Jeep had she known about these material issues.

110.    Car Connection's concealments and/or misrepresentations regarding the reason for the increase in the Jeep's purchase price, the Jeep's actual mileage, and the reason for the lower mileage on the documents were intended to induce Ms. Rogers into purchasing the Jeep.

111.    As set forth above, Ms. Rogers justifiably relied on Car Connection's concealments and/or misrepresentations.

112.    Car Connection acted with malice (reckless, wanton, willful, or gross behavior), ill will, or aggravated or egregious fraud in committing fraud against Ms. Rogers.

16

113.    As a direct and proximate result, Ms. Rogers suffered damages. Ms. Rogers is entitled to recover compensatory and punitive damages and attorney's fees, costs, and expenses.

### CLAIM 14
### Derivative Liability Under the FTC Holder Rule
### (Only Against Defendant Credit Acceptance)

114.    Ms. Rogers realleges and incorporates the allegations contained in each of the preceding paragraphs as though expressly restated herein.

115.    Upon information and belief, the Retail Installment Sale Contract signed by Ms. Rogers contains the Holder Rule notice mandated by the Federal Trade Commission.

116.    Credit Acceptance was the assignee of the Retail Installment Sale Contract and is therefore subject to all claims and defenses that Ms. Rogers could assert against Car Connection.

117.    Credit Acceptance has derivative liability to Ms. Rogers if there is a finding of fact that Car Connection violated any law.

118.    As a direct and proximate result, Plaintiff suffered damages.

### PRAYER FOR RELIEF

**WHEREFORE**, Claimant Tayshawna Rogers respectfully prays for relief against Respondent Car Connection of Mentor Inc. as follows:

A.    For, actual or statutory damages and attorney's fees, costs, and expenses under the CSPA, the exact amount to be proven at trial;

B.    For, actual or statutory damages and attorney's fees, costs, and expenses under 15 U.S.C. § 1640, the exact amount to be proven at trial;

C.    For, the amount Car Connection charged Ms. Rogers in excess of the 8% finance charge permitted on a retail installment contract per R.C. §§ 1317.06(A)(1) and (D), the exact amount to be proven at trial;

D.    For the amount of, compensatory and punitive damages and attorney's fees in a civil action under R.C. § 2307.60, the exact amount to be proven at trial;

17

E. For the amount of, damages for Car Connection's odometer violations as permitted under the Ohio Odometer Act, the exact amount to be proven at trial;

F. For the amount of $10,000.00 in statutory damages or three times actual damages (whichever is greater) and attorney's fees, costs, and expenses, the exact amount to be proven at trial for violations of the Federal Odometer Act;

G. All compensatory, statutory, actual, and punitive damages permitted under the various statutes;

H. For reasonable attorney's fees, costs, and expenses;

I. For pre-judgment and post-judgment interest at the statutory rate; and

J. For such other and further relief as this Court deems just and equitable.

Respectfully submitted,

*/s/Ronald I. Frederick*
Ronald I. Frederick (0063609)
Brian E. Roof (0071451)
**Frederick & Berler, LLC**
767 East 185th Street
Cleveland, Ohio 44119
Telephone: (216) 502-1055
Fax: (216) 609-0750
ronf@clevelandconsumerlaw.com
brianr@clevelandconsumerlaw.com

*Counsel for Claimant Tayshawna Rogers*

Plaintiff requests a jury on all claims and issues of the maximum number of jurors allowed by law.

*/s/Ronald I. Frederick*
Ronald I. Frederick (0063609)
**Frederick & Berler, LLC**

*One of the Attorneys for Plaintiff Tayshawna Rogers*

18

## **CERTIFICATE OF SERVICE**

I hereby certify a copy of the foregoing was filed electronically on this 17th day of June 2026. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system. Additionally, a copy of the foregoing was sent via electronic mail to the following parties:

Nicholas E. Froning
Susannah Schroeder
Koblentz & Penvose, LLC
nick@koblentzlaw.com
susannah@koblentzlaw.com

*Counsel for Defendant Car Connection of Mentor, Inc.*

James W. Sandy
Hinshaw & Culbertson LLP
jsandy@hinshawlaw.com

*Counsel for Defendant Credit Acceptance Corporation*

19

BILL OF SALE

**SELLER INFORMATION:**

CAR CONNECTION OF MENTOR INC
1756 MENTOR AVE
PAINESVILLE, OH 44077

REDACTED

DATE: 2/25/2026    STOCK #: M1286

# EXHIBIT A

**BUYER INFORMATION:**

TAYSHAWNA ROGERS
27100 LAKE SHORE BLVD
EUCLID, OH 44132

COUNTY: CUYAHOGA
WORK:
STATE: OH    EXP. DATE:

HOME: REDACTED    CELL:

D.L. STATE #: REDACTED

D.O.B.:

SALESPERSON:

**VEHICLE INFORMATION:**

STOCK: M1286
COLOR 1: WHITE
COLOR 2:

ODOMETER READING:
113757    ☐ NOT ACCURATE

The Odometer Reading for the Vehicle is accurate unless the "Not Accurate" box is checked. Refer to the Federal Odometer Statement for full disclosure.

☐ NEW  ☒ USED
☐ DEMO  ☐ RENTAL
☐ SALVAGE  ☐ REBUILT
☐ FACTORY OFFICIAL

YEAR: 2015
MAKE: JEEP
MODEL: CHEROKEE
VIN: 1C4PJMBS2FW649564
BODY: 4DR

TRANS: AUTO    CYL: 6
STYLE: TRAILHAWK

**TRADE-IN INFORMATION:**

YEAR:
MAKE:
MODEL:
VIN:
BALANCE OWED TO:

BALANCE OWED: $ 0.00
ALLOWANCE: $ 0.00

COLOR:
BODY:
ODOMETER READING:

GOOD THROUGH:
QUOTED BY:

**INSURANCE INFORMATION:**

COMPANY:
AGENT:
POLICY #:

PHONE:

**LIEN HOLDER INFORMATION:**

COMPANY: Credit Acceptance
STREET: 25505 W twelvemile rd
CITY, STATE, ZIP: SOUTHFIELD, MI 48084

**REMARKS:**

| SETTLEMENT | |
|---|---|
| VEHICLE PRICE | 8,301.00 |
| Documentary Service Charge: | 398.00 |
| SUBTOTAL | 8,699.00 |
| Sales Tax: | 942.64 |
| Title Fee: | 15.00 |
| Registration Fee: | N/A |
| Temporary Tag Fee: | 20.00 |
| Filing Fee: | N/A |
| Transaction Fee: | N/A |
| Payoff on Trade-in: | N/A |
| Service Contract: | 3,063.00 |
| | |
| Paint Sealant: | 399.00 |
| | |
| TOTAL DUE | 13,158.64 |

| CREDIT | | |
|---|---|---|
| TRADE-IN ALLOWANCE | N/A |
| DEPOSIT | 6,000.00 |
| DOWN PAYMENT | N/A |

| TOTAL CREDIT | 6,000.00 |
|---|---|
| ☐ Cash ☒ Finance    BALANCE DUE | 7,158.64 |

If financed, please see your installment sales contract for information about finance charge, insurance, and terms of payment (other than cash).

**WARRANTY DISCLAIMER:** Unless Seller provides a written warranty, or enters into a service contract within 90 days from the date of this contract, this vehicle is being sold "AS IS - WITH ALL FAULTS" and Seller makes no warranties, express or implied, on the vehicle, and there will be no implied warranties of merchantability or of fitness for a particular purpose. This disclaimer does not affect any warranties by the vehicle manufacturer. Seller neither assumes nor authorizes any other person to assume for it any liability in connection with the sale of the vehicle and the related products and services.

**CONTRACTUAL DISCLOSURE STATEMENT (USED VEHICLES ONLY)** The information you see on the window form for this vehicle is part of this contract. Information on the window form overrides any contrary provisions in the contract of sale. (Spanish Translation: Guía para compradores de vehículos usados. La información que ve en el formulario de la ventanilla para este vehículo forma parte del presente contrato. La información del formulario de la ventanilla deja sin efecto toda disposición en contrario contenida en el contrato de venta.)

The following documents are integrated herein:

**Deposit or Partial Payment:**

The sum of $ 6,000.00 was received as a Deposit/Partial Payment. It ☐ IS ☒ IS NOT refundable, subject to conditions set forth in this agreement. In the case of a Deposit, Seller will refrain from selling vehicle for __N/A__ days.

X

**Negative Equity:**

The Balance Owed on the Trade-in/Lease Turn-in Vehicle exceeds the Trade-in Allowance from Seller. As a result, the Balance Due has been increased by $____N/A____

X

BUYER, BY SIGNING THIS AGREEMENT, ACKNOWLEDGES THAT THEY HAVE READ BOTH PAGES OF THIS AGREEMENT, AND HAVE RECEIVED A TRUE COPY OF THIS AGREEMENT. This agreement consists of two pages, be sure to read and initial Page 2 as indicated.

X _____  2/25/26
Approved by Authorized Representative of Seller    Date

This agreement is not valid unless signed and accepted by an authorized representative of the Seller.

X _____  2/25/26
Buyer    Date

X _____  N/A
Co-Buyer    Date

REDACTED

Page 1 of 2

©2026 Frazer Computing, LLC.

**BILL OF SALE**

DATE:  2/25/2026          STOCK #:  M1286

## TERMS AND CONDITIONS

1. Buyer is of legal age and agrees to purchase the vehicle described on Page 1 from Seller. Buyer has read, understands, and agrees to all of the terms and conditions on both pages. This agreement is not binding until an authorized representative of Seller has signed Page 1. Buyer and Seller may have executed an installment sale contract with additional terms of the sale which remains in full force and effect.

2. All relevant documents signed for this sale, including this agreement, any integrated documents, and any installment sale agreement or arbitration agreement, make up the entire agreement between Buyer and Seller, and supersede all previous oral or written agreements or discussions. Buyer is not relying on anything not in this agreement. Any change to this agreement must be in writing and both Buyer and Seller must sign it. _____ (Initials)

3. The vehicle being purchased has a "Buyer's Guide" attached.

4. If the vehicle is being sold "As Is", **BUYER IS NOT ENTITLED TO RECOVER FROM SELLER ANY DAMAGES OR FOR LOSS OF USE, TIME, OR PROFITS/INCOME.** Buyer is responsible for the risk and expense of any repairs or defects on the vehicle now or after the sale.

5. If this is a cash sale, including Buyer bringing a check from their own finance source, Buyer must pay any deposit, partial payment, down payment, and remaining Balance Due by the sale date. If this is an outside financed sale with an installment contract, where Seller is assisting Buyer in obtaining financing from an outside finance source, this agreement is not binding if the outside finance source doesn't purchase the contract.

6. If the sale is not completed for any reason, including outside financing not being secured, Buyer has 24 hours after notification from Seller to return the vehicle. Buyer has to pay for any damage to the vehicle. If Buyer doesn't return the vehicle in the time given, Seller may cancel the sale and retake the vehicle. If this happens, Buyer must pay any related expenses as allowed by law.

7. If there is any delay or failure of delivery that is not in Seller's control and is not Seller's fault, Seller is not liable for the delay or failure. If the vehicle is not delivered to Buyer as specified on Page 1, this agreement may be renegotiated or canceled with full refund of any Deposit or Partial Payment.

8. If there is a trade vehicle:
   a. Buyer will make sure Seller receives the title to the trade vehicle at the time of sale. Buyer has a good and marketable title for the trade vehicle, and the trade vehicle is free and clear of all liens and encumbrances unless a payoff is listed for the trade vehicle on Page 1. If there is a payoff due on the trade vehicle, Buyer has provided an accurate amount and is responsible for any additional amount owed to the payoff lien holder in order to get the title for the trade vehicle to Seller. Buyer will compensate Seller for any excess amounts paid to secure title to the trade vehicle.
   b. Seller may reappraise the trade vehicle if it is not surrendered at the time of sale. If the reappraisal value is lower than the trade allowance listed on Page 1, Buyer may cancel the sale with full refund of any Deposit or Partial Payment as long as the vehicle purchased hasn't been delivered yet and the Buyer hasn't surrendered the trade vehicle yet.
   c. If Buyer cancels the sale for any reason listed in this agreement, Buyer must pay for storage of the trade vehicle and any repairs, and then the vehicle will be returned to Buyer. If Buyer cancels the sale for any reason not listed in this agreement, Seller can sell the trade vehicle to pay expenses resulting from Buyer refusing to complete the sale. If the sale is cancelled and the trade vehicle is already sold, Seller owes Buyer the proceeds less any expenses relating to the trade vehicle.

9. If Buyer cancels the sale for any reason not listed in this agreement, Seller is permitted to retain an amount equal to any actual damages Seller incurs due to Buyer's default. Seller may keep any portion of the amount Buyer has paid to Seller as a Deposit or Partial payment to offset against the amount Buyer owes Seller. If the actual amount Buyer owes to Seller is greater than the amount of the Deposit or Partial Payment, Buyer agrees to pay the difference to Seller. If the actual amount Buyer owes is less than the amount of the Deposit or Partial Payment, Seller will pay the difference to Buyer.

10. Only taxes listed in the Settlement are included in this sale. Buyer has to pay for all taxes applicable to the sale.

11. Buyer must sign any other forms needed for this sale, at the time of sale and after the sale.

12. This agreement is subject to and will be enforced by Ohio state laws.

13. If any part of this agreement is not valid, legal, or enforceable in any way, all other parts remain valid.

14. If Buyer's check or other payment instrument is dishonored or unpaid for any reason, Seller may cancel the sale and retake the vehicle, make a claim against Buyer, or charge Buyer a bad check fee.

15. If there is also an installment contract and anything in that contract contradicts anything in this form, the terms of the contract supersede the terms of this agreement.

Initials _____ Buyer _____ Co-Buyer  N/A  Seller _____

FZ-OH-BOS rev. 0825                    Page 2 of 2                    ©2025 Frazer Computing, LLC

# EXHIBIT B

## NON-NEGOTIABLE - FOR REGISTRATION ONLY

### STATE OF OHIO
### MEMORANDUM TITLE

| | |
|---|---|
| ISSUING COUNTY | LAKE |
| ISSUING TITLE OFFICE # | 4301 |
| RESIDENT COUNTY | CUYAHOGA |

TITLE No. **REDACTED**

ISSUE DATE  04/15/2026

IDENTIFICATION NUMBER
**1C4PJMBS2FW649564**

CONVERSION

| YEAR | MAKE | MAKE DESCRIPTION |
|---|---|---|
| 2015 | JEEP | JEEP |

| MILEAGE | BODY TYPE | MODEL DESCRIPTION |
|---|---|---|
| 113,757 | SW | CHEROKEE |

EVIDENCE
**REDACTED**

MILEAGE NOTATION
**ACTUAL**

COMMENTS

| PURCHASE PRICE | TAX |
|---|---|
| $11,384.00 | $910.72 |

NOTATION(S)

OWNER(S)
**TAYSHAWNA ROGERS**

**27100 LAKE SHORE BLVD**
**EUCLID, OH 44132**

PREVIOUS OWNER(S)
CAR CONNECTION OF MENTOR INC

1756 MENTOR AVE
PAINESVILLE, OH 44077

DEALER PERMIT
**REDACTED**



FIRST LIENHOLDER          DATE OF LIEN 04/15/2026
CREDIT ACCEPTANCE CORPORATION

25505 W. 12 MILE RD.
SOUTHFIELD, MI 48034

DO NOT DESTROY

WITNESS MY HAND AND OFFICIAL SEAL THIS 15TH DAY OF APRIL, 2026

**REDACTED**

| | | |
|---|---|---|
| CARL DIFRANCO | | LMB |
| CLERK OF COURTS | G | LMB |

Copy of Electronic Original
Case: 1:26-cv-01496-PAG  Doc #: 1-1  Filed: 06/30/26  31 of 37.  PageID #: 36
Not required to mail or fax this copy to Credit Acceptance

# EXHIBIT C

## RETAIL INSTALLMENT CONTRACT

ACCOUNT # ▓▓▓▓▓▓▓                                        LOT # ANX0

| Buyer Name and Address | Co-Buyer Name and Address | Creditor-Seller Name and Address |
|---|---|---|
| TAYSHAWNA ROGERS<br>27100 LAKE SHORE BLVD<br>EUCLID, OH 44132 | N/A | CAR CONNECTION OF MENTOR INC<br>1756 MENTOR AVE<br>PAINESVILLE, OH 44077 |

"You" and "Your" mean each Buyer above, jointly and severally. "Us" and "We" mean Creditor-Seller. You may buy the Vehicle described below for cash or credit. By signing this Retail Installment Contract ("Contract") You have agreed to buy the Vehicle on credit. You agree to pay Us all amounts due under the Contract, including the Amount Financed plus Finance Charge according to the payment schedule in the Truth in Lending Disclosures below. We will figure Your finance charges on a daily basis at a rate of __19.99__% per year ("Contract Rate"). You also agree to the terms and conditions (including the Truth in Lending Disclosures) on the additional pages of this Contract. The Contract Rate may be negotiable with Us. You acknowledge delivery and acceptance of the Vehicle in good condition and repair.

| | Year and Make | Model | Color | Vehicle Identification Number | Odometer Reading |
|---|---|---|---|---|---|
| Used | 2015 Jeep | Cherokee | WHITE | 1C4PJMBS2FW649564 | 113,757 |

## TRUTH IN LENDING DISCLOSURES

| ANNUAL PERCENTAGE RATE<br>The cost of Your credit as a yearly rate. | FINANCE CHARGE<br>The dollar amount the credit will cost You. | Amount Financed<br>The amount of credit provided to You or on Your behalf. | Total of Payments<br>The amount You will have paid after You have made all payments as scheduled. | Total Sale Price<br>The total cost of Your purchase on credit, including Your down payment of |
|---|---|---|---|---|
| 19.99 % | $ 4,449.74 | $ 7,158.64 | $ 11,608.38 | $ 6,000.00 is<br>$ 17,608.38 |

**Payment Schedule:** Your payment schedule will be:

| No. of Payments | Amount of Payments | When Payments Are Due |
|---|---|---|
| | $ | |
| | $ | |
| 63 | $ 184.26 | Monthly, beginning March 25, 2026 |

**Security:** You are giving a security interest in the Vehicle being purchased.

**Late Charge:** If a payment is more than 10 days late, You will be charged 5% of the payment, not to exceed $30.

**Prepayment:** If You pay early, You will not have to pay a penalty.

**Additional Information:** Please read this Contract for any additional information about nonpayment, default and any required repayment in full before the scheduled date, and prepayment refunds and penalties.

THE INSURANCE, IF ANY, REFERRED TO IN THIS CONTRACT DOES NOT INCLUDE COVERAGE FOR BODILY INJURY LIABILITY, PUBLIC LIABILITY AND PROPERTY DAMAGE LIABILITY OR COMPLY WITH ANY MINIMUM STATE LIABILITY LAWS.

PROPERTY INSURANCE: You must insure the Vehicle securing this Contract. YOU MAY PURCHASE OR PROVIDE THE INSURANCE THROUGH ANYONE YOU CHOOSE WHO IS REASONABLY ACCEPTABLE TO US, as more fully described on page 3.

DISPUTE RESOLUTION WITH ARBITRATION: This Contract contains a Dispute Resolution Agreement including a Waiver of Jury Trial, Waiver of Class Actions, and an Arbitration Clause stating that, under certain circumstances, any Dispute You and We are unable to resolve through negotiation will be resolved by arbitration and not by court action. See the Dispute Resolution Agreement starting on page 5 of this Contract for the full terms and conditions. By initialing below, you confirm that you have read, understand and agree to the terms and conditions in the Dispute Resolution Agreement.

⇨ Buyer's Initials _____          Buyer's Initials _____

NOTICE: ANY HOLDER OF THIS CONSUMER CREDIT CONTRACT IS SUBJECT TO ALL CLAIMS AND DEFENSES WHICH THE DEBTOR COULD ASSERT AGAINST THE SELLER OF GOODS OR SERVICES OBTAINED PURSUANT HERETO OR WITH THE PROCEEDS HEREOF. RECOVERY HEREUNDER BY THE DEBTOR SHALL NOT EXCEED AMOUNTS PAID BY THE DEBTOR HEREUNDER.

USED CAR BUYERS GUIDE. THE INFORMATION YOU SEE ON THE WINDOW FORM FOR THIS VEHICLE IS PART OF THIS CONTRACT. INFORMATION ON THE WINDOW FORM OVERRIDES ANY CONTRARY PROVISIONS IN THE CONTRACT OF SALE.

Guía para compradores de vehículos usados. La información que ve en el formulario de la ventanilla para este vehículo forma parte del presente contrato. La información del formulario de la ventanilla deja sin efecto toda disposición en contrario contenida en el contrato de venta.

ADDITIONAL TERMS AND CONDITIONS: THE ADDITIONAL TERMS AND CONDITIONS, INCLUDING THE **AGREEMENT TO ARBITRATE** SET FORTH ON THE ADDITIONAL PAGES OF THIS CONTRACT ARE A PART OF THIS CONTRACT AND ARE INCORPORATED HEREIN BY REFERENCE

⇨ Buyer's Initials _____

Buyer's Initials _____

OHIO CREDIT ACCEPTANCE CORPORATION (07-2025)
© 2012-2025 Credit Acceptance Corporation.
All Rights Reserved.

PAGE 1 of 6

The original retail installment contract is assigned to Credit Acceptance Corporation.
This copy was created on 02/25/2026

## ITEMIZATION OF AMOUNT FINANCED

1. **Cash Price** (including accessories and improvements to the Vehicle) ........................................ $ 8,700.00 (1)
2. Sales Tax ............................................................................................................................... $ 942.64 (2)
3. Down-Payment Calculation:    **Cash Down Payment** ........................$ 6,000.00 (A)

                                   Deferred Down Payment. .............................$ N/A (B)

   **Trade-In Description**:    Gross Trade-In ............. $ N/A (C)
   Make: N/A
   Model: N/A    Payoff Made by Seller  $ N/A (D)
   Net Trade-In (If negative number, Insert "0" in line 3(D) and itemize difference in 5(F) below)… (C-D) $ N/A (E)

   **Trade-In Description**:    Gross Trade-In. ........... $ N/A (F)
   Make: N/A
   Model: N/A    Payoff Made by Seller  $ N/A (G)
   Net Trade-In (If negative number, Insert "0" in line 3(G) and itemize difference in 5(K) below)… (F-G) $ N/A (H)
   Other: Manufacturers Rebate. .......................................................................$ N/A (I)

                       **Total Down Payment**.................................... (A+B+E+H+I) $ 6,000.00 (3)

4. **Unpaid Balance of Cash Price** (1+ 2 less 3). ..................................................................... $ 3,642.64 (4)
5. Other Charges Including Amounts Paid to Others on Your Behalf:

   *(NOTICE: A portion of these charges may be paid to or retained by Us.)

   A.   *Cost of Required Physical Damage Insurance Paid to Insurance Company .................................. $ N/A (A)
   B.   *Cost of Optional Extended Warranty or Service Contract Paid to the Company named below....... $ 3,083.00 (B)
   C.   *Documentation Fee ....................................................................................................... $ 398.00 (C)
   D.   Cost of Fees Paid to Public Officials for Perfecting, Releasing or Satisfying a Security Interest........ $ N/A (D)
   E.   Cost of Fees Paid to Public Officials for Certificate of Title, License and Registration ...................... $ 35.00 (E)
        Other Charges (Seller must identify who will receive payment and describe purpose)
   F.   to N/A    for lien or lease payoff ................................................. $ N/A (F)
   G.   *to N/A    for Optional GAP Protection ...................................... $ N/A (G)
   H.   *to N/A    for N/A    $ N/A (H)
   I.   *to N/A    for N/A    $ N/A (I)
   J.   *to N/A    for N/A    $ N/A (J)
   K.   *to N/A    for lien or lease payoff .................................................. $ N/A (K)
   Total of Other Charges and Amounts Paid to Others on Your Behalf...................................... $ 3,516.00 (5)
6. Less Prepaid Finance Charge............................................................................................... $ N/A (6)
7. **Amount Financed - Unpaid Balance** (4 + 5 less 6) ............................................................. $ 7,158.64 (7)

**OPTIONAL EXTENDED WARRANTY OR SERVICE CONTRACT:** Although You are not required to purchase an optional extended warranty or service contract as a condition of purchasing this Vehicle on credit, by signing below You are indicating that You voluntarily elect to buy an optional extended warranty or service contract covering the repair of certain major mechanical breakdowns of the Vehicle and related expenses. Refer to the optional extended warranty or service contract for details about coverage and duration.

Price $ 3,083.00    Term: 24,000 Miles/24 Mos.    Company: **Wynn's Extended Care, Inc.**

eSigned By: *Napoleone Rogers* Feb 25, 2026 2:36:31 PM EST    02/25/2026
Buyer's Signature        Date        Buyer's Signature        Date

**GAP PROTECTION: Optional Guaranteed Auto Protection (GAP) is not required to obtain credit.** GAP protection will not be provided under this Contract unless You sign for it below and agree to pay the additional cost shown below and on Line 5G of the ITEMIZATION OF AMOUNT FINANCED. You may obtain optional GAP protection from a person of Your choice that is authorized to sell such coverage and is acceptable to Us. The GAP contract issued by the provider of the protection will describe the terms and conditions of coverage in further detail. If You want GAP protection, sign below.

Cost: $ N/A    Term: N/A    Provider: N/A

****NOT PURCHASED - DO NOT SIGN****
Buyer's Signature        Date        Buyer's Signature        Date

*You agree to the terms of this Contract and acknowledge that You have received a copy of this Contract with all blanks filled in and that You have read it and understand it.*
*NOTICE TO THE BUYER: 1. Do not sign this Contract before You read it or if it contains any blank spaces. 2. You are entitled to an exact copy of the Contract You sign.*

Buyer's Signature: x eSigned By: *Napoleone Rogers* Feb 25, 2026 2:36:31 PM EST    Buyer's Signature: x

Seller: CAR CONNECTION OF MENTOR INC    By: eSigned By: *Jayden Lloyd* Feb 25, 2026 2:33:39 PM EST    Title: AGENT

This Contract is signed by the Seller and Buyer(s) hereto this 25th day of February , 2026

COPY OF ELECTRONIC ORIGINAL

OHIO CREDIT ACCEPTANCE CORPORATION (07-2025)
© 2012-2025 Credit Acceptance Corporation.
All Rights Reserved.

PAGE 2 of 6

The original retail installment contract is assigned to Credit Acceptance Corporation.
This copy was created on 02/25/2026

Copy of Electronic Original
Not required to mail or fax this copy to Credit Acceptance

# ADDITIONAL TERMS AND CONDITIONS

**Security Interest and Assignment of Proceeds.** You give Us a security interest in the Vehicle. This secures payment of all You owe on this Contract and in any transfer, renewal, extension or assignment of this Contract. It also secures Your other agreements in this Contract. You agree to have the certificate of title show our security interest (lien) in the Vehicle. Until Your obligations under this Contract are satisfied, You assign to Us all Your right, title and interest in and to: 1) all parts or goods put on the Vehicle; 2) all money or goods received (proceeds) for the Vehicle (including all parts or goods put on the Vehicle); 3) all insurance, service, or other contracts We finance for You; and 4) all proceeds from insurance, service, or other contracts We finance for You. This includes any refunds of premiums.

**Late Charge.** You promise to make all payments when due. If You fail to make a payment when it is due, You agree to pay Us a late charge as stated on page 1 of this Contract. You agree that We do not waive any of our rights by accepting one or more late payments from You.

**Ownership and Risk of Loss.** You promise to pay Us all You owe under this Contract even if the Vehicle is damaged, destroyed or missing.

**Bad Check Charge.** You agree to pay Us a bad check charge of $20 (or such other amount permitted by applicable law) for any check or like instrument given by You to Us that is returned by Your bank because of insufficient funds or because Your bank account was closed.

**Your Other Promises to Us.** You promise that:
- You will not remove the Vehicle from the United States or Canada.
- You will not sell, rent, lease or otherwise transfer any interest in the Vehicle or this Contract without our written permission.
- You will not expose the Vehicle to misuse or confiscation.
- You will not permit any other lien or security interest to be placed on the Vehicle.
- You will preserve and protect the Vehicle and keep it in good condition and repair.
- You will not use the Vehicle unlawfully or abandon it. If a governmental agency impounds the Vehicle, You will notify Us immediately and regain possession of the Vehicle.
  We may regain possession of the Vehicle and treat it as a default.
- You will pay all taxes, assessments, rentals, charges, and other fees imposed on the Vehicle when they are due. If We pay any repair bills, storage bills, taxes, fines, fees, or other charges on the Vehicle, You agree to repay the amount to Us.
- You will permit Us to inspect the Vehicle at any reasonable time.
- You will promptly sign, or cause others to sign, and give Us any documents We reasonably request to perfect our security interest.
- You have not made and will not make an untrue, misleading or incomplete statement in a credit application, this Contract or any information provided in connection with this Contract.
- You will promptly provide Us with any additional personal or financial information concerning You or any information about the Vehicle that We may reasonably request from time to time.
- You will immediately notify Us if You change Your name or address.

**Finance Charge.** This is a simple interest contract. Finance charges are earned on a daily basis by applying the Contract Rate to the unpaid balance of the Amount Financed for the time the balance is owed. We will apply payments to late charges, finance charges, and to the unpaid balance of the Amount Financed and other charges in any manner we choose unless we are required by law to apply payments in a particular order. After assignment, the Seller may receive a portion of the finance charges.

**Prepayment.** You have the right to prepay Your account balance at any time without a penalty.

If You prepay only a portion of the balance remaining under this Contract, We will apply the prepayment to Your account balance. Your payment due date will advance by one month each time a standard monthly payment is satisfied in full by a prepayment. You must still make all payments on time until Your obligation under this Contract is paid in full. If You make a partial prepayment Your last payment or payments may be less than the scheduled amount due.

**Late or Early Payments.** The Finance Charge, Total of Payments, and Total Sale Price shown on the front of this Contract are based on the assumption that You will make every payment on the date it is due. Your Finance Charge, Total of Payments, and Total Sale Price will be more if You pay later and less if You pay early. Changes may take the form of a larger or smaller final payment or, at Our option, more or fewer payments of the same amount as your scheduled payment with a smaller final payment.

**Required Physical Damage Insurance.** You must insure Yourself and Us for the term of this Contract against loss of, or physical damage to, the Vehicle with a policy in Your name that is acceptable to Us. We have the right to approve the type and amount of insurance.

If the Vehicle is lost or damaged, You agree that We can use any insurance settlement either to repair the Vehicle or apply to Your account balance. If applied to Your account balance, the insurance settlement proceeds that do not pay Your obligation in full under this Contract will be applied as a partial payment.

**Optional Maintenance or Service Contracts.** This Contract may contain charges for optional maintenance, service or warranty contracts. If the Vehicle is repossessed, You agree that We may claim benefits under these contracts and terminate them to obtain refunds of unearned charges.

**Insurance, Maintenance, Service or Other Contract Charges Returned to Us.** If any charge for insurance, maintenance, service, warranty or other contract is returned to Us, it will be credited to Your account in accordance with the Prepayment section of this Contract.

**Default and Acceleration of the Contract.** You will be in default if:
- You fail to pay any amount due under this Contract when it is due.
- You break any of Your other promises You made in this Contract.
- A proceeding in bankruptcy, receivership or insolvency is started by You or against You or Your property.

If You are in default of this Contract, We may declare the entire unpaid balance of this Contract due and payable immediately at any time without notice to You, unless We are required by law to provide You with such notice, and subject to any right You may have to reinstate the Contract. If Your default consists solely of a failure to pay a payment when it is due, We may demand that You pay all that You owe on this Contract only if Your failure to pay has continued for at least thirty (30) days.

Buyer's Initials _____

Buyer's Initials _____

The original retail installment contract is assigned to Credit Acceptance Corporation.
This copy was created on 02/25/2026

Copy of Electronic Original

Not required to mail or fax this copy to Credit Acceptance

# ADDITIONAL TERMS AND CONDITIONS

**Repossession of the Vehicle.** If You default, We may take (repossess) the Vehicle from You. To repossess the Vehicle, We can enter Your property, or the property where the Vehicle is stored, so long as it is done peacefully and the law allows it. Any accessories, equipment or replacements will remain with the Vehicle. You hereby acknowledge and agree that any personal property contained within the Vehicle may be removed and held without liability to Us or our agent. It is Your responsibility to promptly and immediately contact Us to make arrangements for the return of Your personal property. You are responsible for paying all reasonable charges associated with the repossession.

**Getting the Vehicle Back After Repossession**. If We repossess the Vehicle, You have the right to get it back (redeem). You may reinstate the Contract as permitted by applicable law. You may redeem the Vehicle at any time before We sell, lease, license or otherwise dispose of any or all of the Vehicle in its present condition or following any commercially reasonable preparation or processing.

**Sale of the Repossessed Vehicle.** Any notice that is required to be given to You of an intended sale or transfer of the Vehicle will be mailed to Your last known address, as reflected in our records, in a reasonable period before the date of the intended sale or transfer (or such other period of time as is required by law). If the Vehicle is sold, We will use the net proceeds of the sale to pay all or part of Your debt.

The net proceeds of the sale will be figured this way: Any charges for taking, holding, preparing for sale, and selling the Vehicle, and any attorney fees and court costs, if permitted by law, will be subtracted from the selling price.

If You owe Us less than the net proceeds of sale, We will pay You the difference, unless We are required to pay it to someone else. For example, We may be required to pay a lender who has given You a loan and has also taken a security interest in the Vehicle.

If You owe more than the net proceeds of sale, You will pay Us the difference between the net proceeds of sale and what You owe when We ask for it. If You do not pay this amount when asked, You may also be charged interest at the highest lawful rate until You do pay all You owe to Us.

**Servicing and Collection Contacts.** You agree that we may try to contact you in writing, by e-mail, or using prerecorded/artificial voice messages, text messages, and automatic telephone dialing systems, as the law allows. You also agree that we may try to contact you in these and other ways at any address or telephone number you provide us, even if the telephone number is a cell phone number or the contact results in a charge to you.

**Delay in Enforcing Rights and Changes of this Contract.** We can delay or refrain from enforcing any of our rights under this Contract without losing them. For example, We can extend the time for making some payments without extending others. Any change in the terms of this Contract must be in writing and signed by Us. No oral changes are binding. If any part of this Contract is not valid, all other parts will remain enforceable.

> WARRANTIES SELLER DISCLAIMS. YOU UNDERSTAND THAT THE SELLER IS NOT OFFERING ANY WARRANTIES AND THAT THERE ARE NO IMPLIED WARRANTIES OF MERCHANTABILITY, OF FITNESS FOR A PARTICULAR PURPOSE, OR ANY OTHER WARRANTIES, EXPRESS OR IMPLIED BY THE SELLER, COVERING THE VEHICLE UNLESS THE SELLER EXTENDS A WRITTEN WARRANTY OR SERVICE CONTRACT WITHIN 90 DAYS FROM THE DATE OF THIS CONTRACT.
>
> THIS PROVISION DOES NOT AFFECT ANY WARRANTIES COVERING THE VEHICLE THAT MAY BE PROVIDED BY THE VEHICLE MANUFACTURER.

**Interest After Maturity.** You further agree to pay interest at the rate of 6% or at the highest rate permitted by applicable law, on any amounts that remain unpaid after maturity of this Contract. For the purposes of this provision, maturity means the earlier of the date Your final payment is due or the date We accelerate the Contract.

**Judgment Rate**. Interest on any judgment awarded on this Contract will be at the Contract Rate stated on page 1 of this Contract or at the highest rate permitted by applicable law.

**State of Contracting.** This Contract shall be deemed to have been made and entered into by the parties at the Seller's address shown on page 1.

**Governing Law.** The rights and duties of the parties, and any claims arising out of or related to this Contract, are governed by law of the state of the Seller's address shown on page 1 of this Contract, except to the extent preempted by applicable federal law.

## ASSIGNMENT

FOR VALUE RECEIVED, Seller hereby assigns and transfers all Seller's right, title and interest in and to this Contract, and in and to the Vehicle described herein, to CREDIT ACCEPTANCE CORPORATION ("Assignee"), its successors and assigns, pursuant to and in accordance with the terms and conditions set forth in the existing dealer agreement between Seller and Assignee in effect on the date hereof. Seller gives Assignee full power, either in Assignee's name or in Seller's name, to take all actions which Seller could have taken under this Contract. In order to induce Assignee to accept assignment of this Contract, Seller represents and warrants to Assignee as set forth in the existing dealer agreement.

**NOTICE OF ASSIGNMENT: The Seller has assigned this Contract to Credit Acceptance Corporation in accordance with the terms and conditions set forth above. This assignment is without recourse. You must make all future payments to: CREDIT ACCEPTANCE CORPORATION, 25505 WEST TWELVE MILE ROAD, SOUTHFIELD, MICHIGAN 48034-8339, 1-(800)-634-1506.**

Seller: CAR CONNECTION OF MENTOR INC    By: _____ eSigned By: *Brayden Lloyd* Feb 25, 2026 2:33:39 PM EST _____    Title: AGENT

Buyer's Initials _____

Buyer's Initials _____

The original retail installment contract is assigned to Credit Acceptance Corporation.
This copy was created on 02/25/2026

Copy of Electronic Original

Not required to mail or fax this copy to Credit Acceptance

# DISPUTE RESOLUTION AGREEMENT

## Binding Individual Arbitration

**This Arbitration Clause (this "Clause") describes how a Dispute (as defined below) may be decided and how, under certain circumstances, Disputes will only be decided through binding, individual arbitration. Arbitration is an alternative to a lawsuit in court and there is less discovery and appellate review. In arbitration, a neutral arbitrator decides the case instead of a judge or jury.**

In this Clause, "We" and "Us" mean Seller and any assignee of the Contract ("Seller's Assignee") (including Credit Acceptance Corporation). Seller and Seller's Assignee also includes past, present, and future employees, assignees, ancillary product providers, and anybody providing goods or services related to originating, servicing, or collecting amounts due under the Contract. "You" and "Your" means each Buyer named above.

You have a right to opt out of this Clause. To opt out, You must send Us a written notice within 30 days of the Contract date that describes the Contract and tells Us that You are opting out of this Clause. You and any co-Buyer or cosigner must sign the written notice and send it to Us at P.O. Box 5070, Southfield, Michigan 48086-5070. Sending this notice does not affect the rest of the Contract terms. If You do not send this written notice within 30 days of the Contract date, this Clause will be effective as of today and you will not be able to opt out of this Clause. Note that by opting out of the Clause, you are opting out of arbitration only and not the class action waiver and jury trial waiver set forth below.

Dispute means any disagreement or claim related to this Contract or between You and Us. "Dispute" broadly includes contract claims, tort claims, and claims for violations of laws, statutes, ordinances, regulations, or any other legal or equitable theories, except "Dispute" does not include:
- any individual claim in Your state's version of small claims court, including any appeal of a small claims court decision;
- any individual claim for collection of Your debt that does not involve a counterclaim or crossclaim;
- any repossession of the Vehicle after You default, or Our right to sell the Vehicle;
- any individual claim You bring to stop Us from repossessing and selling the Vehicle, as long as You do not ask for money; or
- any disagreements or claims concerning intellectual property rights.

Dispute shall include, but not be limited to:
- Disputes that arose before the existence of this Clause (including, but not limited to, claims relating to advertising);
- Disputes that are currently the subject of purported class action litigation in which you are not a member of a certified class; and
- Disputes that may arise after termination of the Contract.

The arbitrator will decide all issues except issues that are reserved for a court herein. Issues for the arbitrator to decide include any Dispute about whether the Contract or any portion of the Contract or this Clause is valid or enforceable, its coverage, or its scope except to the extent reserved specifically for a court herein. If You have opted out of arbitration by following the process set forth above, all issues are for a court of competent jurisdiction to decide.

You and we agree that the Contract evidences a transaction in interstate commerce and that this Clause will be interpreted and enforced in accordance with the Federal Arbitration Act and federal arbitration law (not state arbitration law). To decide a Dispute, the arbitrator must apply the substantive law that governs this Contract, and the arbitrator must honor statutes of limitation and privilege rights. Except as specifically provided in this Clause (e.g., the Waiver of Class Actions and the Mass Arbitration sections), if an arbitrator, or court where applicable, finds that any part of this Clause is invalid or unenforceable, the remainder of this Clause will continue to apply to You and Us. If at any time there is an agreement to arbitrate claims or disputes that is different from this Clause, this Clause will apply instead of that agreement.

## Mandatory Informal Dispute Resolution

If there is a Dispute, the complaining party must give the other party written notice (a "Dispute Notice") before commencing arbitration. The other party shall have at least 60 days to resolve the Dispute. The complaining party must cooperate if the other party makes reasonable requests for information about the Dispute and will not commence arbitration during that 60-day period.

If We have a Dispute, We will send a Dispute Notice to Your address on this Contract (or any updated address You later give Us). Alternatively, We may send You a Dispute Notice by electronic mail or other electronic communication channels if you agree to receive electronic communications from Us. If You have a Dispute, You must mail Us a Dispute Notice to: Credit Acceptance, Attn: Corporate Legal, 25505 West Twelve Mile Road, Southfield, Michigan 48034-8339 (or any updated address We later give You.)

For Your Dispute Notice to be valid You need to do certain things. Your Dispute Notice must include Your Account Number, telephone number and address. It must explain what the Dispute is about and what You would like us to do. You must sign Your Dispute Notice. If You or We send a Dispute Notice, the other party can ask for a telephone call to discuss the Dispute. Each party (and the party's attorney, if any) must be on the telephone call. **The time spent trying to resolve the Dispute following delivery of a Dispute Notice will not count toward any statutory limitation period.**

You must complete the Dispute Notice requirements before starting arbitration. A court will have authority to enforce these requirements. A court can stop an arbitration from being filed or stop any arbitration that has been filed if these requirements are not followed. Any arbitration demand must state in writing that the steps in this section have been completed.

## Arbitration Procedures

The arbitration of any Dispute shall be administered by and conducted in accordance with the applicable rules of the American Arbitration Association ("AAA"), including the AAA's Consumer Arbitration Rules and Supplementary Rules for Mass Arbitration (where appropriate) ("AAA Rules"), as modified by this Clause. The AAA Rules are available online at www.adr.org. Each party has the right to challenge the application of the AAA's Consumer Arbitration Rules in connection with a Dispute as a threshold administrative issue should it maintain other rules apply (i.e., the AAA's Commercial Arbitration Rules). If the AAA is unavailable or unwilling to administer the arbitration consistent with this Clause, the parties shall agree to have the arbitration administered by National Arbitration & Mediation (NAM) or JAMS under their applicable rules and procedures, including any mass arbitration rules and procedures, as modified by this Clause. The NAM rules can be found at www.namadr.com and the JAMS rules can be found at www.jamsadr.com. If the parties cannot agree, they shall petition a court of competent jurisdiction to appoint NAM, JAMS, or another administrator that will administer the arbitration consistent with this Clause. The AAA Rules or applicable provider's rules shall be referred to herein as "the Rules."

If You are submitting an arbitration demand, you shall send it to Credit Acceptance, Attn: Corporate Legal, 25505 West Twelve Mile Road, Southfield, Michigan 48034-8339 (or any updated address We later give You) and follow the Rules for initiating arbitration. If We are submitting an arbitration demand, We shall send it to the most recent address We have on file for You and follow the Rules for initiating arbitration.

By submitting an arbitration demand, the party and counsel represent that, as in federal court, they are complying with the requirements of Federal Rule of Civil Procedure 11(b). The arbitrator is authorized to impose any sanctions available under Federal Rule of Civil Procedure 11 on represented parties and their counsel.

Buyer's Initials _____

Buyer's Initials _____

OHIO CREDIT ACCEPTANCE CORPORATION (07-2025)
© 2012-2025 Credit Acceptance Corporation.
All Rights Reserved.

PAGE 5 of 6

The original retail installment contract is assigned to Credit Acceptance Corporation.
This copy was created on 02/25/2026

Copy of Electronic Original

Not required to mail or fax this copy to Credit Acceptance

The arbitrator may decide that a Dispute can be resolved on written papers without an in-person hearing. However, any Dispute that is part of a Mass Arbitration (defined below) shall have an in-person or video hearing unless the parties agree otherwise. The arbitrator can choose to have any hearing remotely. You and Our representative will personally appear at any hearing (with counsel, if represented). Any in-person arbitration hearing that You attend will be designated in accordance with the Rules and at a place that is reasonably convenient for You. Notice of the time, date and location will be provided to You and Us under the Rules.

An arbitrator may award on an individual basis any relief that would be available in a court, including injunctive or declaratory relief only in favor of the individual party seeking relief and only to the extent necessary to provide relief warranted by that party's individual claim. To the fullest extent permitted by applicable law, You and We agree that each may bring claims against the other only in Your or Our individual capacity and not as a plaintiff or class member in any purported class, collective, consolidated, private attorney general, or representative proceeding. Further, unless both You and We agree otherwise, an arbitrator may not consolidate more than one person's claims and may not otherwise preside over any form of class, collective, private attorney general, or representative proceeding. An arbitrator must follow and enforce this Agreement as a court would. If, after exhaustion of all appeals, any of these prohibitions on non-individualized injunctive or declaratory relief and class, collective, private attorney general, or representative proceedings are found to be unenforceable with respect to a particular claim or request for relief (such as a request for public injunctive relief), then such a claim or request for relief will be decided by a court of competent jurisdiction, after all other claims and requests for relief are arbitrated. The arbitrator shall issue a reasoned written decision sufficient to explain essential findings and conclusions. The arbitrator shall apply the cost-shifting provisions of Federal Rule of Civil Procedure 68 after entry of an award. Judgment on any arbitration award may be entered in any court of competent jurisdiction, except an award that has been satisfied may not be entered. An award shall have no preclusive effect in any other arbitration or proceeding in which You are not a named party. Arbitration may be requested at any time, even where there is a pending lawsuit, unless a trial has begun, or a final judgment entered.

The arbitrator's decision is final and binding, except for any right to appeal under the Federal Arbitration Act, 9 U.S.C. §§ 1 et seq. ("FAA"). But if the award is for monetary or other relief that could be worth or cost more than $100,000, You or We can appeal the award. The appeal will be to a three-arbitrator panel through the arbitration organization. The panel's decision will be by majority vote. If there is an appeal of an initial award, "arbitrator" as used in this Clause will also mean the panel. This Clause's section on costs for the initial arbitration will also apply if there is an appeal

### Costs of Arbitration
Payment of arbitration fees will be governed by the Rules. You and We agree that the parties have a shared interest in reducing the costs and increasing the efficiencies associated with arbitration. Therefore, You or We may elect to engage with the AAA (or the applicable provider) regarding arbitration fees, and You and We agree that the parties (and counsel, if represented) will work together in good faith to ensure that arbitration remains cost-effective for all parties.

### Additional Procedures for Mass Arbitration
If You choose to participate in a "Mass Arbitration" (defined below), these Additional Procedures for Mass Arbitration will apply. **The other Sections of this Clause will still apply.**

You agree that these additional procedures will apply if the same counsel or counsel working together or in coordination with one another assert 25 or more similar or coordinated Disputes (including Yours) against Us ("Mass Arbitration"). You and We agree that as part of these procedures, Your and Our counsel shall meet and confer in good faith in an effort to resolve the Disputes, streamline procedures, address the exchange of information, modify the number of Disputes to be adjudicated, and conserve the parties' and the AAA's (or applicable provider's) resources. If Your claim is part of a Mass Arbitration, any applicable limitations periods (including statutes of limitations) shall be tolled for Your Dispute from the time that Your Dispute is first submitted to the AAA (or the applicable provider) until Your Dispute is selected to proceed as part of a staged process or is settled, withdrawn, otherwise resolved, or opted out of arbitration pursuant to this provision.

**STAGE ONE**: If there are at least 100 Disputes in the Mass Arbitration, Your counsel and Our counsel will choose 50 Disputes each to be filed and to proceed as individual arbitrations as part of this initial staged process. Either side can decide to have its 50 Disputes chosen randomly. The number of Disputes to be selected to proceed in Stage One can be increased by agreement of counsel for the parties (and if there are fewer than 100 Disputes, all shall proceed individually in Stage One). Each of the cases shall be assigned to a different arbitrator and proceed individually. If a case is withdrawn before the issuance of an arbitration award, another claim shall be selected to proceed as part of Stage One. The remaining Disputes shall not be filed or deemed filed in arbitration nor shall any arbitration fees be assessed or collected in connection with those claims.

If, after this first set of staged proceedings, the parties cannot resolve the Disputes on their own, they will participate in a global mediation of all remaining Disputes. The parties will jointly select a mediator to mediate and attempt to resolve the remaining Disputes (considering the outcome of cases in Stage One.) We will pay the mediator's fee.

**STAGE TWO:** If the remaining Disputes have not been resolved at the end of Stage One, the parties will each choose 100 Disputes to proceed as individual arbitrations. These Disputes may follow a different process if the parties agree to it in writing after mediation. Either party may choose to have its 100 Disputes chosen randomly. The parties can agree to increase the number of Disputes selected to proceed in Stage Two. If there are fewer than 200 Disputes remaining, all will proceed individually in Stage Two.

No more than three cases may be assigned to a single arbitrator to proceed individually unless the parties agree in writing. If a Dispute is withdrawn without both parties permission, then another Dispute will be selected to proceed as part of Stage Two. The remaining Disputes shall not be filed or deemed filed in arbitration nor shall any arbitration fees be assessed or collected in connection with those claims. After Stage Two is complete, the parties will engage in a mediation of all remaining Disputes. The parties will jointly select a mediator to mediate any Disputes that were not resolved in Stages One or Two. We will pay the mediator's fee.

After the mediation session, if there are more than 200 Disputes that are not settled or withdrawn each remaining Dispute that is not settled or withdrawn will be opted out of arbitration and may proceed in a court of competent jurisdiction on an individual basis consistent with the remaining provisions of the Contract. After the mediation session, if there are 200 or fewer disputes that are not settled or withdrawn, all will proceed individually in arbitration.

A court of competent jurisdiction shall have the authority to enforce the Additional Procedures for Mass Arbitration, including the power to enjoin the filing or prosecution of arbitrations and the assessment or collection of arbitration fees. The Additional Procedures for Mass Arbitration provision and each of its requirements are essential parts of this Clause. If, after exhaustion of all appeals, a court of competent jurisdiction decides that the Additional Procedures for Mass Arbitration apply to Your Dispute and are not enforceable, then Your Dispute shall not proceed in arbitration and shall only proceed in a court of competent jurisdiction on an individual basis consistent with the remainder of the Clause.

### Waiver of Jury Trial; Waiver of Class Actions
TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, YOU AND WE KNOWINGLY, VOLUNTARILY AND UNCONDITIONALLY WAIVE THE RIGHT TO A JURY TRIAL. YOU AND WE ALSO KNOWINGLY, VOLUNTARILY AND UNCONDITIONALLY WAIVE ANY RIGHT TO BRING OR PARTICIPATE IN A CLASS ACTION IN ARBITRATION OR IN COURT. HOWEVER, THE PARTIES SHALL STILL HAVE THE RIGHT TO PARTICIPATE IN A CLASS-WIDE SETTLEMENT. THIS WAIVER OF JURY TRIAL AND WAIVER OF CLASS ACTIONS PROVISION IS AN ESSENTIAL PART OF THIS AGREEMENT AND APPLIES EVEN IF THE CONTRACT IS TERMINATED OR EXPIRES. IF THE CLASS ACTION WAIVER IS FOUND TO BE UNENFORCEABLE, THEN, ONCE AN APPEAL IS OVER, THIS ENTIRE CLAUSE, EXCEPT FOR THE JURY TRIAL WAIVER AND THIS SENTENCE, WILL BE UNENFORCEABLE.

OHIO CREDIT ACCEPTANCE CORPORATION (07-2025)
© 2012-2025 Credit Acceptance Corporation.
All Rights Reserved.

PAGE 6 of 6

Buyer's Initials _____

Buyer's Initials _____

The original retail installment contract is assigned to Credit Acceptance Corporation.

This copy was created on 02/25/2026

# ODOMETER DISCLOSURE STATEMENT

Federal law (and state law, if applicable) requires that you state the mileage upon transfer of ownership. Failure to complete or providing a false statement may result in fines and/or imprisonment.

I, CAR CONNECTION OF MENTOR INC _____ state that the odometer now reads 113757 miles and that it reflects the actual mileage of the vehicle described below to the best of my knowledge, unless one of the following statements has been checked.

[ ]  (1) I hereby certify that to the best of my knowledge the odometer reading reflects the amount of mileage in excess of its mechanical limits.

[ ]  (2) I hereby certify that the odometer reading is NOT the actual mileage.
WARNING:  ODOMETER DISCREPANCY.

Vehicle Description:  2015 JEEP CHEROKEE, WHITE
Body Type:  4DR
VIN:  1C4PJMBS2FW649564
Stock #:  M1286

Transferor's (Seller) Information:  CAR CONNECTION OF MENTOR INC
1756 MENTOR AVE
PAINESVILLE, OH 44077

Acknowledged by Transferor (Seller):

Signature: _____  02/25/2026

Printed Name: _____

Transferee's (Buyer) Information:  TAYSHAWNA ROGERS
27100 LAKE SHORE BLVD
EUCLID, OH 44132

Acknowledged by Transferee (Buyer):

Signature: _____  02/25/2026

Printed Name: _____

©2022 Frazer Computing, LLC